IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:24-CV-00023-D

**Nicholas Blake**,

        Plaintiff,

v.

**Leland C. Dudek,** Acting Commissioner of Social Security,[1]

        Defendant.

**Memorandum & Recommendation**

Plaintiff Nicholas Blake challenges an Administrative Law Judge's decision to deny his application for social security income. Blake claims that the ALJ erred in reaching that determination when evaluating the medical opinion of his treating provider. And this error, Blake argues, infected the ALJ's determination of his residual functional capacity (RFC). Both Blake and Defendant Leland Dudek, Acting Commissioner of Social Security, seek a decision in their favor. D.E. 11, 12.

After reviewing the parties' arguments, the undersigned has determined that the ALJ erred in his determination. The record does not support the ALJ's reasons to discount a treating provider's opinions. Given this error, the undersigned cannot conclude that substantial evidence supports the RFC determination. The undersigned thus recommends that the court grant Blake relief, deny Dudek relief, and remand this matter to the Acting Commissioner for further consideration.[2]

---

[1] The court substitutes Leland C. Dudek for former defendant Martin O'Malley. *See* Fed. R. Civ. P 25(d).

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b). D.E. 14.

## I. Background

### A. Factual

Blake has a history of autism, bipolar, depressive, anxiety, and obsessive-compulsive disorders. Tr. at 19. He received childhood benefits based on his autism diagnosis.

Prior to his alleged onset date, Blake had a consultative psychological evaluation with Janice McGilberry, LPA/LPC and Shiahna Dye, Ph.D. Tr. at 315–19. Blake reported anxiety attacks, depression, and struggling when plans derailed or things were disorganized. Tr. at 26. He could follow directions but preferred short, concise, and written instructions. Tr. at 27. Blake did not have a driver's license but was independent in daily activities. *Id.*

On examination, Blake showed adequate attention, occasionally unorganized and tangential thinking, and average recall, judgment, and insight. *Id.* The examiners assessed autism and a depressive disorder. Tr. at 28. And they concluded that he could understand, follow, and retain instructions to perform simple, routine, repetitive tasks and maintain concentration, persistence, and pace. Tr. at 318. He would not struggle with daily stress and had no difficulty interacting with others. *Id.*

Before his July 2020 disability onset date, Blake obtained three positions through Vocational Rehabilitation. He first worked as a laborer in a peanut factory for two months in the fall of 2018. Tr. at 220. He stopped because he developed allergies. Tr. at 56–57. He had two other jobs—stocker and janitor—for a brief time before his onset date. Tr. at 220. He received too few work hours for the stocker position and was terminated from his janitorial position. Tr. at 59.

2

After his alleged onset date, Blake visited Coastal Carolina Family Practice in March 2022. Tr. at 28. He was irritable, depressed, and experienced sleep disturbances. *Id.* The provider diagnosed autism and mood changes that could stem from bipolar disorder.

The next month, Tamara L. Stevens, M.A., performed a consultative psychological evaluation. Tr. at 362–69. In addition to autism, Blake had an unspecified depressive disorder and had a 17-day hospitalization for suicidal ideation. Tr. at 362–63. He also reported anxiety, panic attacks, and post-traumatic stress disorder (PTSD) from childhood abuse. Tr. at 363–64.

A mental status examination showed poor eye contact, poor social interaction, relevant but overly detailed speech, apparent but subtle communication difficulties, missed social cues, adequate attention, and trouble focusing on tasks. Tr. at 366. Blake had limited insight and difficulty taking responsibility for his actions. Tr. at 367.

Stevens diagnosed Blake with autism spectrum disorder, generalized anxiety disorder, and panic disorder. Tr. at 368. She concluded that he would experience difficulty sustaining attention for routine, repetitive tasks and working at a consistent pace. *Id.* Although he appeared to interact effectively on the surface, Blake had challenges relating to others consistently because of his unusual social skills. *Id.* And he would have trouble tolerating the stress of daily work and may require ongoing social skills training. *Id.*

Five months later, Patricia Reading, M.S. Ed., LCAS, with Pathways Counseling Center submitted a statement. Tr. at 380–81. She had provided mental health treatment to Blake since 2017. Tr. at 380. Reading remarked that Blake was not progressing well and there was no improvement in his depression. *Id.* He had poor eye contact and difficulty expressing emotions and acting in a socially appropriate manner. *Id.* He suffered from panic attacks and his depression symptoms averaged seven or eight on the Likert scale. *Id.* Blake struggled with concentration,

3

motivation, and connection to others. Tr. at 380–81. Reading's assessment included autism spectrum disorder, PTSD, and major depressive disorder. Tr. at 381.

Reading provided another statement in May 2023. Tr. at 430–31. She noted his depression symptoms had continued without improvement. Tr. at 430. Blake had been unable to keep three jobs because of difficulty talking to others and completing assignments. Tr. at 430–31.

One month later, Reading provided a statement summarizing her recent telehealth conversations with Blake. Tr. at 433–34. He reported hopelessness, appetite disturbance, a lack of control, and an inability to communicate with others. *Id.*

In a Medical Evaluation Report later that month, Reading noted that Blake's impairments included autism spectrum disorder, PTSD, major depressive disorder, and a social communication disorder. Tr. at 437. She found that he had moderate limitations in maintaining attention and concentration over extended periods, working with or around others, and getting along with others without distraction. Tr. at 437–38. Blake had marked limitations in remembering work-like procedures, carrying out detailed instructions, accepting instruction and responding appropriately to criticism, and traveling to unfamiliar places. *Id.* And he had extreme limitations in understanding and remembering simple and detailed instructions, making simple, work-related decisions, completing a normal workday or workweek, performing at a consistent pace, interacting with the public, asking simple questions, maintaining socially appropriate behavior, responding to customary work stresses, and setting realistic goals. *Id.*

State agency consultants found that Blake could understand and retain simple instructions and maintain concentration, persistence, and pace for two-hour periods to perform simple, routine, repetitive tasks. Tr. at 34. He could tolerate incidental public interactions and brief, superficial

4

interactions with coworkers and supervisors. *Id.* And Blake could adapt to change in a non-production-oriented work setting. *Id.*

Blake testified that he has difficulty communicating with others, misunderstanding directions, accepting criticism, asking for help, and handling stress. Tr. at 59–60. He had a panic attack at his last job and shuts down when overwhelmed. Tr. at 60. He cannot afford mental health treatment due to a lack of finances and insurance. Tr. at 62–63.

Blake lives with his parents. Tr. at 22. He had challenges understanding others. *Id.* Blake had few friends and struggles with using the phone and texting. *Id.* Blake could perform household chores but often wrestled with a lack of motivation. *Id.* He became overwhelmed ahead of the hearing and experienced breakdowns. Tr. at 23.

**B. Procedural**

In June 2021, Blake applied for supplemental security income alleging a disability that began in July 2020.[3] After the Social Security Administration denied his claim at the initial level and upon reconsideration, Blake appeared for a video hearing before an ALJ to determine whether he was entitled to benefits. The ALJ determined Blake had no right to benefits because he was not disabled. Tr. at 17–43.

The ALJ found that Blake lived with several severe impairments. Among these were left autism, anxiety, obsessive-compulsive disorder (OCD), and bipolar, depressive, and related disorder. Tr. at 19. The ALJ also found that Blake's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 20.

Next, the ALJ determined that Blake had the residual functional capacity (RFC) to perform work at all exertion levels with non-exertional limitations. Tr. at 21. He can perform short, simple,

---

[3] Blake later amended his alleged disability onset date to June 2021. Tr. at 18.

routine, repetitive tasks in two-hour intervals. *Id.* Blake cannot do fast-paced or assembly line work. *Id.* And he requires a work setting with little change in its structure. *Id.*

Blake can occasionally have superficial interaction with the public. *Id.* And he can occasionally have direct interactions with supervisors and coworkers provided it does not require him to work in tandem or in teams. *Id.*

Then the ALJ concluded that Blake had no past relevant work. Tr. at 41. But considering his age, education, work experience, and RFC, the ALJ determined that he could perform other jobs that existed in significant numbers in the national economy. Tr. at 42. These positions include linen clerk, salvage laborer, and cleaner II. *Id.* These findings led the ALJ to conclude that Blake was not disabled. Tr. at 43.

After the Appeals Council denied review, Blake commenced this action in May 2024. D.E. 1. Both parties ask the court to issue a decision in their favor. D.E. 11, 12.

**II. Analysis**

Blake contends that the reasons the ALJ offered in discounting some of Reading's conclusions do not withstand scrutiny. As he correctly points out, the ALJ cited no conflicting evidence from the relevant period. And the ALJ mischaracterized some evidence to discredit certain limitations that Reading found. Blake maintains, and the undersigned agrees, that the evidence establishes that Reading's assessment is supported by, and consistent with, the overall record.

The ALJ's error in evaluating Reading's conclusions casts doubt on the RFC determination. Restrictions that Reading found, but the RFC omitted, require further consideration. Whether the RFC should include those limitations, or there are sound reasons offered why the RFC need not adopt them, forms a basis for remand for further consideration.

6

### A. Standard for Review of the Acting Commissioner's Final Decision

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B. Standard for Evaluating Disability

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id.*

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id.*

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is not warranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

**C.     Treating Provider's Opinion**

Blake argues that the ALJ erred in considering the medical opinions from his treating mental health provider, Patricia Reading. The Acting Commissioner asserts that the ALJ's decision

8

Case 2:24-cv-00023-D-RN     Document 15     Filed 04/22/25     Page 8 of 17

reflects a sound explanation for declining to endorse some of Reading's conclusions. The undersigned finds that the ALJ offered inadequate reasons for finding the opinions unpersuasive.

### 1. Medical Opinion Evidence

The Regulations direct the ALJ to consider each medical opinion in the record. 20 C.F.R. §§ 404.1520c, 416.920c. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [following] abilities ...

> (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* §§ 404.1520(a)(2), 416.913(a)(2).

The Regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a).[4]

---

[4] Because Blake filed his application after March 27, 2017, the revised rules for the assessment of medical opinion evidence govern how the ALJ considers the medical opinions here.

Instead, the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors:

> (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations, purpose of the treating relationship, extent of the treatment relationship, and whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) other factors that tend to support or contradict a medical opinion."

*Id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

Supportability and consistency are the "most important" factors, and the ALJ must discuss how they considered these factors in the written opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may explain their consideration of the other factors but need only do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *Id.*

The Regulations require the ALJ to "articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b), 416.920c(b). But when a medical source provides multiple opinions, the ALJ may use a single analysis to evaluate all the opinions from a single source, and the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

10

### 2. Residual Functional Capacity

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

11

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio*, 780 F.3d at 636. But "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The function-by-function requirement can be satisfied by reference to a properly conducted analysis by a state agency consultant. *See, e.g.*, *Linares* v. *Colvin*, No. 5:14-CV-00129, 2015 WL 4389533, at *3 (W.D.N.C. July 17, 2015) ("Because the ALJ based his RFC finding, in part, on the function-by-function analysis of the State agency consultant, the ALJ's function-by-function analysis complied with [Soc. Sec. Ruling] 96–8p." (citing *Lemken* v. *Astrue*, No. 5:07-CV-33-RLV-DCK, 2010 WL 5057130, at *8 (W.D.N.C. July 26, 2010))).

The ALJ determined that Blake could work at all exertional levels with non-exertional restrictions. Tr. at 21. He could perform simple, routine, repetitive tasks in two-hour intervals. *Id.*

But he could not do fast-paced or production rate work. *Id.* Blake could have occasional interactions with others. *Id.* And Blake required a work setting with little structural change. *Id.*

### 3. Analysis

Reading made several findings about Blake's functional limitations. Tr. at 38–41. The ALJ found some persuasive and some unpersuasive. *Id.* Blake takes issues with restrictions Reading found but the ALJ rejected.

Reading determined that Blake had marked limitations in his ability to remember work-like procedures, an extreme limitation in remembering short and simple instructions with a mild limitation in carrying them out, and extreme limitations in interacting appropriately, maintaining socially appropriate behavior, performing at a consistent pace, and carrying out a normal workday or workweek.

The ALJ determined that these particular limitations were unpersuasive. *Id.* For restrictions in remembering work-like procedures and remembering and carrying out short, simple instructions, the ALJ remarked that Blake was overly diligent in completing tasks, could learn a new tasks, and had satisfactory results on testing his ability for recall. Tr. at 38–39. He also pointed to Blake's statement that he could follow directions but preferred short, concise, and written instructions. Tr. at 39.

As to limitations in performing at a consistent pace and completing a normal workday or workweek, the ALJ noted that Blake performed adequately at his peanut factory job, despite being prone to mental breakdowns and panic or anxiety attacks, "zoning out," or appearing self-absorbed. Tr. at 39–40.

The ALJ concluded that Blake had moderate, not extreme, limitations in interacting with others. Tr. at 40. He cited Blake's ability to communicate effectively, although he had impaired

13

social skills. *Id.* And while recognizing Blake's impaired social skills, the ALJ discounted an extreme limitation in maintaining socially appropriate behavior by referencing his work at the peanut factory, which he left because of allergies.

Blake contends that the reasons cited by the ALJ to discredit Reading's findings do not withstand scrutiny. He argues that the ALJ mischaracterized the evidence and relied on evidence outside the relevant period. Blake maintains that the record supports and tracks Reading's conclusions.

Dudek does not address Blake's argument. Instead, he recites the ALJ's discussion of Reading's assessment and his consideration of her conclusions. *See* D.E. 12 at 6–22. So it adds little, if any, to the court's analysis of the issues Blake raises.

The record supports Blake's argument. First, Blake challenges the ALJ's reference to him being overly-diligent at completing tasks. But the ALJ failed to convey the full context of Reading's observation. Her September 2022 report reflects Blake's statement that he "attempted to complete work tasks but is overly diligent resulting in him being 'slow' to complete the work." Tr. at 380. Reading also remarked that "frequent panic attacks [] keep him from finishing tasks." Tr. at 380–81. So the excerpt the ALJ cited misstates Reading's report. Contrary to the ALJ's conclusion that Reading's findings lacked support, Blake's "over diligence" impeded his work performance, causing him to be slow and interfering with task completion. So this reason does not provide a sound basis to discount Reading' conclusions.

Second, Blake argues that the ALJ relied on evidence outside the relevant period to dispute Reading's assessments. And he contends that her conclusions follow other evidence from the relevant period.

14

The ALJ referenced Blake's work at the peanut factory to conclude he could communicate effectively and follow directions. But his work there for two months in 2018, and two later jobs, predate his disability onset date of July 2021. So it does not show his ability to communicate effectively or follow directions during the period at issue.

The same flaw applies to the consultative examiners' observation in August 2019 that Blake could follow directions but preferred they be short, concise, and written. These examiners also noted that he could learn new tasks. In finding Reading's conclusions inconsistent with the record, the ALJ again cites evidence from almost two years before Blake's disability onset date. What corroboration this evidence, and the ALJ's reliance on it, offers to Blake's abilities during the relevant period is thus questionable.

Third, Blake maintains that the ALJ erred in citing his ability to recall 5/5 words immediately and 3/5 works after five minutes. These findings are part of Stevens's April 2022 consultative examination which, Blake submits, backs Reading's assessments. He points out that Stevens's other observation—poor eye contact, poor social skills, relevant but overly detailed speech with tangents, missed social cues extending conversation beyond socially appropriate parameters, apparent but subtle communication difficulties, missed nonverbal cues, difficulty with social reciprocity, and challenges with focusing on formal mental tasks—track Reading's observations like poor eye contact, distractibility, difficulty with socially appropriate behavior, poor concentration, sometimes appearing self-absorbed, trouble communicating with others, and challenges in completing assignments. Tr. at 366, 380, 430.

Although Blake reported problems with memory, Stevens determined that he appeared capable of understanding, retaining, and following directions. Tr. at 368. But Blake would have trouble sustaining attention for routine or repetitive tasks and working at an adequate pace when

15

he was anxious or overly anxious or over-stimulated. *Id.* Although Blake appeared to communicate effectively on the surface, he would have difficulty relating to others consistently, given his unusual social skills. *Id.* Stevens concluded that Blake would have trouble tolerating stress and may need ongoing social skill training. *Id.*[5]

Blake contends that Reading's conclusions about his concentration, social interaction, and adaption skills follow Stevens's assessment. The undersigned agrees. Both providers noted Blake's limitations communicating with and relating to others, maintaining socially appropriate behavior, sustaining attention and pace, and tolerating the stress of daily work. Given that the two's findings largely track one another, Stevens's evaluation provides little in the way of evidence undermining Reading's conclusions. Given the overall consistency of the two evaluators, the ALJ erred in citing Stevens's immediate recall testing as a basis to decline to endorse Reading's conclusions on Blake's abilities in concentration, interaction, and adaption.

In sum, the record does not support the reasons the ALJ offered in discounting many of Reading's conclusions. Lacking a sound basis to reject her assessed limitations, the ALJ erred in evaluating her opinions. This mistake could infect the RFC determination and the subsequent steps of the sequential evaluation. The undersigned thus cannot find that substantial evidence supports the ALJ's decision.

Blake presents a meritorious argument. So the undersigned recommends that the court remand the matter to the Acting Commissioner for further consideration.

---

[5] The ALJ determined found Stevens's evaluation persuasive. Tr. at 35.

### III. Conclusion

For these reasons, the undersigned recommends that the court grant Blake's request for relief (D.E. 11), deny Dudek's request for relief (D.E. 12), and remand this matter to the Acting Commissioner for additional consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: April 22, 2025

_____
Robert T. Numbers, II
United States Magistrate Judge